PLATON, Respondent, vs. DEPARTMENT OF TAXATION, Appellant.*

*May 7—June 2, 1953.*

* Motion for rehearing denied, without costs, on September 11, 1953.

For the appellant there were briefs by the *Attorney General,* and *Harold H. Persons* and *E. Weston Wood,* assistant attorneys general, and oral argument by *Mr. Persons* and *Mr. Wood.*

For the respondent there was a brief by *Rieser, Mathys, McNamara & Stafford* of Madison, and oral argument by *William A. McNamara.*

CURRIE, J.    Sec. 71.11 (6), Stats. 1951 (sec. 71.09 (9), Stats. 1943 and 1945), provides:

"Any person failing to make an income-tax report or making an incorrect income-tax report, *with intent in either case to defeat or evade the income-tax assessment required by law,* shall be assessed at twice the normal income-tax rate by the proper taxing authority. Such increased assessment shall be in addition to all other penalties of section 71.11." (Italics supplied.)

The only issue on this appeal is whether there is sufficient evidence in the record to sustain the finding by the board that taxpayer did make incorrect income-tax reports for the years 1944, 1945, and 1946 *"with intent . . . to defeat or evade"* the tax due under the income-tax statutes on his income for such three years.

In order to impose the penalty provided under sec. 71.09 (9), Stats. 1943 and 1945, the intent of taxpayer to defeat or evade the tax due must be proved by clear and convincing evidence. The board recognized this rule in its decision in *Fred A. Lange, Jr., v. Wisconsin Department of Taxation* (1947), 3 Wis. B. T. A. 295, 309, in which case it had before it this same penalty statute, and stated:

". . . the penalty cannot be properly imposed unless there is a basis for concluding that it was because of an intention to evade the tax thereon that such item was not reported. The

omission of income, to be fraudulent, must be so proved. *Appeal of Godwin,* 34 B. T. A. 485. We regard the evidence pertaining to these items as being too uncertain to justify the imposition of the double rate. On the issue of fraud, the burden rested upon respondent [department] to prove by clear and convincing evidence not only that the petitioner had income he failed to report, but that his failure to report it was with intent to evade tax. *Appeal of O'Neil Estate,* 35 B. T. A. 975 (page 988)."

Inasmuch as these review proceedings are instituted under the Uniform Administrative Procedure Act, the provision of sec. 227.20 (1) (d), Stats., applies and the reviewing court may reverse or modify the decision of the board only if the same is "unsupported by substantial evidence in view of the entire record as submitted." The brief of the attorney general contends that substantial evidence "in view of the entire record" requires that the reviewing court must apply the same substantial-evidence test in reviewing the record in this case as it would in the review of any other determination of an administrative agency. With this contention we cannot agree because the intent of taxpayer to defeat or evade the tax must have been proved before the board by clear and convincing evidence. Therefore, "substantial evidence in view of the entire record" in reviewing the board's finding of intent to evade tax must be evidence which is clear and convincing.

In *Duffin v. Lucas* (6th Cir. 1932), 55 Fed. (2d) 786, the court had before it the same procedural question with which we are faced on this appeal, as the United States circuit court of appeals in reviewing a decision of a United States district court must affirm the judgment of the district court if there is "any substantial evidence" to support the judgment. In that case the district court had in its judgment imposed a fraud penalty, and the circuit court of appeals in considering what test should be applied by it in reviewing the evidence stated (p. 798) :

"In appropriate cases there is a presumption that the commissioner's action was rightful; but it is a fundamental rule of judicial procedure that *fraud cannot be lightly inferred but must be established by clear and convincing proof.* It may well be that the right to due process would be infringed by a rule of procedure which abolished this fundamental principle and authorized a finding of fraud—at least, if involving a felony—to be based on that minimum called 'any substantial evidence.' Certainly, as we think, in a suit to recover back such a penalty, *the general presumption that the commissioner was right has no evidential effect of itself sufficient to support a judgment affirming the penalty,* its effect being procedural only; and *the rule that a finding of fact by the judge in the district court will be affirmed by us if there is any substantial evidence to support it, does not avail to sustain such finding of fraud if we conclude that the proof relied upon is insufficient in law to be rightly regarded as clear, convincing, or satisfying.*" (Emphasis supplied.)

We must assume in the instant case that the board, in making its finding embodied in its decision, that the taxpayer "during the years 1944, 1945, and 1946 failed and neglected to report his taxable income with intent to defeat or evade his income-tax assessment as required by law," did so upon the basis that the same was supported by clear and convincing evidence.

Taxpayer was born in Greece and attended school there, such schooling being the equivalent of completing the fourth grade in our Wisconsin school system. He came to this country in 1910 at the age of eighteen and worked as a railroad section hand at La Crosse for approximately two years. Then he came to Madison and worked as a baggageman for the same railroad, loading and unloading baggage until about 1926. Then he opened his present store, Cinderella Frocks, in its present location in the city of Madison, which he has been operating ever since. About a year or so previous to that, he had started a store while still employed by the railroad, which business had failed.

After coming to Madison, taxpayer took various courses at the Madison vocational school, such as English, business arithmetic, elementary accounting, and salesmanship. He kept his own business records while operating his store, and made out his own income-tax returns. He is unmarried and for many years has rented the same room at a rental of $16 per month. He eats his meals at drugstores and cheap restaurants. He owns no automobile, and has never taken a vacation.

Taxpayer testified at considerable length at the hearing conducted by the board, and the answers given by him to the questions propounded are stated in good English and disclose that he is a man of considerable intelligence. Those exhibits which are in his own handwriting display good penmanship.

Taxpayer's net taxable income for the three years in question as reported by the income-tax returns prepared and filed by him is as follows:

        1944.....................$8,049.64
        1945..................... 8,341.19
        1946..................... 6,981.02

However, his net taxable income as determined by the board in its findings for these three years is as follows:

        1944.....................$33,967.35
        1945..................... 43,877.64
        1946..................... 35,688.85

So that the unreported income for such three years is as follows:

        1944.....................$25,917.71
        1945..................... 35,536.45
        1946..................... 28,707.83

    Total unreported income:        $90,161.99

As previously mentioned in the statement of facts preceding this opinion, the assessments made by the field audit of the department are largely based upon the cash deposits made by taxpayer in his bank account. The accountant for taxpayer, who was engaged by him after he got into these tax difficulties, prepared an exhibit (Exhibit K) which was offered and received in evidence before the board. Such exhibit was labeled "Computation of taxable income and taxes due thereon—1943–1946, inclusive." However, such computation disclosed a total additional taxable income for the years 1944, 1945, and 1946 in excess of $41,000. The difference between this figure and the $90,000 figure (using round numbers) of unreported income found by the board is due to two items,—"Inventory overstatement" and "Agency deposits omitted."

Taxpayer testified that in order to get a good Dun & Bradstreet rating he had, for quite a number of years prior to 1947, overstated his inventory. His closing inventory, as disclosed by his 1946 income-tax return, was $71,979, which he claims was overstated by approximately $41,000 because it included obsolete merchandise. Overstatement of the closing inventory has the result for income-tax purposes of increasing net taxable income. Taxpayer's accountant, in his computation constituting Exhibit K, therefore took this approximately $41,000 overstatement of inventory and allocated it over the four-year period of 1943–1946, inclusive, so that approximately $30,500 thereof was applied against 1944, 1945, and 1946.

Taxpayer's explanation of the $18,500 "Agency deposits omitted," which his accountant in Exhibit K apportioned equally to the years 1945 and 1946, is that he had brothers in Greece who were engaged in the wholesale textile business and who, in the period following the close of World War II, were fearful that the communists were going to take over Greece. They therefore arranged to send all the funds they

could get together over to taxpayer to hold for them so as to get the money out of Greece into this country. These funds came in currency, bank money orders, New York drafts, and personal checks of Greek-Americans in this country. Taxpayer purposely kept no record of any of these receipts because he was under the impression that such transfer of funds was illegal both under the laws of Greece and of this country. No supporting bank records of any kind were offered to substantiate taxpayer's testimony as to the receipt of any of these moneys.

Taxpayer, at the hearing before the board, was asked by his counsel how he accounted for the balance of approximately $41,000 unreported income for 1944, 1945, and 1946, which Exhibit K, prepared by his own accountant, disclosed to be due after giving full credit for the claimed overstatement of inventory and the receipt of money from his brothers in Greece. Taxpayer answered that such discrepancy was due to moneys he received as rentals or proceeds of sale from Illinois real estate; proceeds received on notes held by him which were paid; moneys received by him from customers to apply on lay-away sales; and payments of accounts receivable.

Taxpayer had owned three residence properties in Illinois on which he received small rentals which he claimed he thought were sold in 1944 or 1945. The field-audit report of the department made an allowance for the income from the taxpayer's Illinois properties, and no claim was made in the subsequent proceedings that such allowance was too small. If any of his Illinois real estate was sold during the three-year period in question there would be records available to establish such sales and the sales price received, but taxpayer made no attempt to produce any such records. If any notes held by taxpayer were paid during the three-year period, taxpayer also should have been able to give the names of the makers or other data which would have given his own accountant and attorneys an opportunity to contact the

makers and obtain supporting proof, but no supporting data or testimony in this respect was offered.

Taxpayer testified that the amounts held by him as down payments on lay-away sales at the end of any of the tax years in question would not exceed from $2,000 to $3,000. He offered no proof that the amount of such moneys held for lay-away sales increased from one year to the next. Likewise, with respect to accounts receivable, he offered no records to show the amounts of accounts receivable at the end of any of the three tax years in question. In order for the lay-away sales moneys to account for increased bank deposits the total of such moneys would have had to increase from one tax year to the next. On the other hand, in order for payments on accounts receivable to account for increased bank deposits, the total of accounts receivable must have been declining from one year to the next so that the amounts being paid on such accounts receivable during the year would be greater than the sales made on credit. Taxpayer made no claim that there was any decline in outstanding accounts receivable during the three-year period.

If the total unreported income was all accounted for by taxpayer as a result of his claim of overstatement of inventory, and the department had no other evidence bearing on intent, there would be very serious doubt as to whether the intent to "defeat or evade" the tax due had been proved by clear and convincing evidence. However, even if we were to accept the explanation of overstated inventory and of the $18,500 in moneys received from the brothers in Greece, there still remained approximately $41,000 of unreported income as to which no satisfactory explanation worthy of belief has been given. This total is significant in view of the fact that his reported income for the three years in question was only $23,371.85. Furthermore, the board had good reason for not believing the explanation as to the $18,500 claimed to have been received from the brothers in Greece, because if

such moneys had been received there would have been bank records which could have been produced to substantiate all of such receipts, except such as were received in currency. It also taxes our credulity that taxpayer would receive such moneys and keep no record whatever of the amounts and dates when so received.

Taxpayer's explanation, that the overstatement of inventory was for the purpose of inducing Dun & Bradstreet to give him a higher credit rating, shows an intent to deceive. The reason advanced by him for keeping no records with respect to receipt of moneys from his brothers in Greece was that he thought there was involved in such transmission and receipt of funds a violation of the laws of both Greece and the United States. The inference raised by such explanations is that taxpayer had no compunctions about engaging in fraudulent or illegal practices. Taxpayer was thus in the unenviable position of offering as a defense to the charge of having cheated on his income tax the explanation that he was engaged in other manipulations of deceit and law violation. This is an additional reason why the board did not have to accept such explanations as verities.

In the case of *Boussen v. Commissioner* (1951), 10 TCM 158 (CCH), the taxpayers husband and wife came to this country as immigrants in 1927. For the next eleven years taxpayer husband was employed as a painter and decorator, and in 1938 he purchased a tavern in Detroit. For the years 1941 through 1944 the taxpayers' reported net income was $12,997.78, whereas the net-worth analysis showed their net-worth income for such years to have been $23,762.97. The taxpayers tried to explain part of this unreported income by stating that they had previously hid $5,000 or $6,000 in an iron box, which amount they had saved during previous years, and that this money was later deposited in a bank account. However, during the previous years their annual income had been small and they then had a savings bank

account. In upholding the federal fraud penalty, the tax board stated (p. 164):

"To establish fraud by direct proof of intent is rarely possible. This court has held that a failure to report income undoubtedly received, such failure being due to an untenable excuse, evidences a fraudulent attitude of mind. [Citing cases.]

"After careful consideration of the entire record and petitioners' conduct on the stand, we are convinced that petitioners fraudulently made false returns for each of the taxable years. The vague, evasive, and contradictory testimony of petitioners, their failure to adequately explain many entries in the diaries, bank deposits, and checks, their elaborate artifice in asserting they had cash savings in an iron box at home, all prevent reliance on the truth of their statements. Petitioners' dealings in the black market overseas in years following the taxable period under consideration further undermine our belief in his innocence of improper motive. The understatements of income are too large, too continuous and persistent to be attributable to mere inadvertence or negligence. Petitioners knew their duty to report all their income and had the requisite intelligence to do so."

While the facts in *Gano v. Commissioner* (1930), 19 U. S. B. T. A. 518, 533, are not similar to those in the instant case, we believe the following quotation from the decision is pertinent:

"A failure to report for taxation income unquestionably received, such action being predicated on a patently lame and untenable excuse, would seem to permit of no difference of opinion. It evidences a fraudulent purpose."

It is our considered judgment that there is sufficient evidence in the record, considered as a whole, to establish by clear and convincing proof that taxpayer did make incorrect income-tax returns for the three years in question with intent to defeat and evade the income tax due on his income for said years, and therefore the finding of the board to such effect should have been affirmed by the trial court.

*By the Court.*—That part of the judgment appealed from is reversed, and cause remanded with directions to enter judgment affirming the decision and order of the Wisconsin board of tax appeals.